## IRWIN v. MAPLE.

### In re GASKILL.

(Circuit Court of Appeals, Sixth Circuit.   May 16, 1918.)

No. 2852. ·

1. BANKRUPTCY ⬤⟿342½—CLAIMS—OBJECTIONS.
   Where two creditors had made formal objection to a claim, contested it before the referee, and reserved exception to its allowance, it was not necessary for the creditors to present their objection in writing as a condition to a review of the referee's action.

2. BANKRUPTCY ⬤⟿342½—REVIEW OF ORDERS OF REFEREE—PETITION.
   Under General Orders in Bankruptcy No. 27 (18 Sup. Ct. viii, 89 Fed. xi, 32 C. C. A. xxvii), no particular formality is required to secure review of orders or other proceedings of the referee apart from the filing of the petition.

3. BANKRUPTCY ⬤⟿9(2)—STATE STATUTES—SUSPENSION.
   Ohio statutes relating to preferential transfers (Gen. Code Ohio, § 11104) are not in effect bankruptcy laws themselves, and so were not suspended by the national Bankruptcy Act.

4. BANKRUPTCY ⬤⟿185—TRUSTEE—RIGHT OF.
   Under Bankruptcy Act, § 70e, a trustee in bankruptcy may recover for the benefit of the estate property transferred in violation of the state law.

*5. COVENANTS ⬤⟿130(4)—BREACH OF WARRANTY—MEASURE OF DAMAGES.
   Under the Ohio rule, where land conveyed under a general warranty is recovered by the owner of a paramount title, the purchaser's measure of damages is the amount of the consideration received by the warrantor, with interest.

6. BANKRUPTCY ⬤⟿303(3)—PREFERENCES—MORTGAGES—EVIDENCE.
   Evidence *held* to show that a mortgage, under which a creditor of the bankrupt claimed priority, was made in contemplation of insolvency, and with the design, known to the creditor, as well as to the bankrupt, to directly prefer the creditor to the exclusion of other creditors.

7. FRAUDULENT CONVEYANCES ⬤⟿3—TRANSFERS—PREFERENCES.
   Ohio statutes (Gen. Code Ohio, § 11104 et seq.), prohibiting preferential transfers, etc., made in contemplation of insolvency, are valid.

8. FRAUDULENT CONVEYANCES ⬤⟿122(2)—PREFERENTIAL TRANSFERS—INVALIDITY.
   A mortgage by which a debtor in contemplation of insolvency intended to prefer one creditor and indirectly to prefer another creditor by providing for the mortgagee's payment of that creditor's claim, is invalid under Gen. Code Ohio, §§ 11104, 11105.

9. FRAUDULENT CONVEYANCES ⬤⟿122(2)—STATUTES—EXCEPTIONS.
   Gen. Code Ohio, § 11105, providing that nothing in section 11104 invalidating preferential transfers, etc., shall vitiate any mortgage made in good faith to secure a debt or liability created simultaneously with the mortgage, etc., is but declaratory of a settled rule of judicial decision, and effect should be given thereto as far as may be done consistently·with the rest of the enactment.

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

10. FRAUDULENT CONVEYANCES ⊜154(1)—PREFERENCES—VALIDITY.

A mortgage, though not recorded within three days, *held* valid in so far as it secured an advance to be made to cover the expense of repairing the mortgaged premises, for as to that item it was not preferential, within Gen. Code Ohio, § 11104, and recordation within three days, as required by section 11105, to take it without the provisions of the first section was unnecessary.

Appeal from the District Court of the United States for the Western Division of the Southern District of Ohio; Howard C. Hollister, Judge.

In the matter of the bankruptcy of Edson M. Gaskill. The claim of Augustus C. Irwin, which was allowed by the referee as a secured debt was reversed on appeal by W. Chester Maple, trustee in bankruptcy, and claimant appeals. Reversed, with directions.

Cobb, Howard & Bailey and Oliver G. Bailey, all of Cincinnati, Ohio, and George E. Young, of Lebanon, Ohio, for appellant.

Wm. R. Collins and Edwin W. Kemper, both of Cincinnati, Ohio, for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. This is an appeal from a decree reversing an order of a referee in which the claim of Irwin, appellant, was allowed as a secured debt. Involuntary proceedings in bankruptcy were commenced against Edson M. Gaskill, June 4, 1914, and he was adjudicated a bankrupt on the 25th of the month. The claim in dispute, verified by Irwin and stating that the bankrupt was indebted to him therefor, consists of a promissory note of the bankrupt, dated at Cincinnati June 25, 1913, payable on or before two years from date, to the order of Louis C. Cordes, for $2,500, with interest at 6 per cent. per annum. On the same date and to secure this note a mortgage was given to Cordes by the bankrupt upon all his real estate, his home, which is situated near Lebanon, Warren county, Ohio. The claim was filed with the referee July 21, and allowed October 22, 1914. Two creditors of the bankrupt, by their counsel, objected to allowance of the claim, or to any finding that the mortgage was valid, or constituted a lien upon the real estate. Upon hearing, the referee found that the promissory note was indorsed by Cordes to Irwin, and that both instruments were "presented to and filed with the referee" by Irwin, and further, in substance, that the claim was good, and that the mortgage constituted a "valid lien" on the real estate to secure payment of the claim, subject, however, to a prior mortgage lien given by the bankrupt to the Lebanon Loan & Building Association.

[1, 2] Therepon the trustee in bankruptcy filed with the referee a petition for review, stating among other things that allowance of the claim "as a secured claim" was error, praying that this error and the "questions of law and fact raised before" the referee and "decided by him" be certified to the District Judge, and that the order be re-

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

viewed, the mortgage declared "to be illegal, fraudulent, and void," etc. The referee filed his certificate, attaching a transcript of the evidence in full. Contention is made, though it cannot be sustained, that the trustee was not entitled to a review. True, as counsel say, it does not appear that prior to filing the petition for review the trustee had made formal objection to the claim; but the two creditors mentioned seasonably appeared by counsel, and not only objected to the claim, but also contested it before the referee, and reserved exception to his action. In these circumstances it was not necessary for the creditors to present their objection in writing (Embry v. Bennett, 162 Fed. 139, 140, 89 C. C. A. 163 [C. C. A. 6]), nor, apart from filing the petition, were any particular formalities required to secure a review of the orders or other proceedings of the referee (General Order in Bankruptcy 27, 210 U. S. 578, 18 Sup. Ct. viii; 89 Fed. xi, 32 C. C. A. xxvii); In re Swift [D. C.] 118 Fed. 348, 349, by Judge Lowell; In re People's Department Store Co. [D. C.] 159 Fed. 286, 287).

In the court below, upon consideration of the proceedings in review "with the testimony as presented to the referee," an order was entered finding that the mortgage is "not a valid lien" against the bankrupt's real estate, and directing the referee to disallow the mortgage, finding further, however, that Irwin "holds an unsecured claim against the bankrupt herein in the sum of $2,500, with interest from June 25, 1913, to the date of adjudication," and directing its allowance "as an unsecured claim."

[3, 4] Plainly the important issue is whether Irwin has a valid mortgage. The determination of this issue must depend upon the statute law of Ohio, and the right of the trustee under the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 544) to challenge the transaction for the common benefit of the bankrupt's creditors. The promissory note and mortgage were executed, as we have seen, nearly a year before the bankruptcy proceeding was begun. It was claimed in Irwin's behalf in the court below, and also here until recently, that the applicable statutes of Ohio are in effect bankruptcy laws themselves, and are suspended by operation of the Bankruptcy Act of Congress, and hence that the contention of the trustee must fail, since the transaction did not occur within the four months period of the Bankruptcy Act. By reason of this contention the hearing of the instant case was postponed through consent of counsel until the question of conflict between the Ohio statutes and the Bankruptcy Act should be determined by the Supreme Court, where upon certificate of this court the question was pending in Stellwagen v. Clum. It was there settled, February 4th last, that the Bankruptcy Act does not operate to suspend the Ohio statutes in question. 245 U. S. 605, 611, 618, 38 Sup. Ct. 215, 62 L. Ed. 507. The decision also sustains the right of the trustee in virtue of section 70e of the Bankruptcy act (Comp. St. 1916, § 9654) to recover property transferred in violation of state law. 245 U. S. 613, 615, 38 Sup. Ct. 215, 62 L. Ed. 507. The right of action so given is enforceable at any time within the period prescribed by the applicable state statutes (Id.); and in Ohio this period is fixed at four years (218 Fed. at page 733, 134 C. C. A. 408, and citations

[C. C. A. 6]). It follows that, if any creditor of the bankrupt might have avoided the mortgage, the trustee may avoid it and recover the bankrupt's interest in the mortgaged property, or in the proceeds derived from its sale.

[5, 6] The question of validity of the mortgage cannot be rightly understood without further statement of some of the facts—some that are scarcely open to serious dispute, concerning the origin, delivery, and transfer of the instrument. Gaskill, the bankrupt, is the father-in-law of Irwin, and to the extent of $2,000, including accrued interest, Irwin's claim against him was a matter of long standing. Gaskill could not pay the claim, and until the note and mortgage were given did not undertake to secure it. Besides, his financial condition was at that time threatened by obligations of somewhat remote origin. As early at least as 1879, Gaskill had by deeds of general warranty conveyed real estate situated in Clermont county, one portion to John D. Randall, and another to Edward Conover, who in turn conveyed it by like deed to David Grossnickle. A claim concerning these lands had recently developed, which, if valid, would directly affect Gaskill upon his covenants of general warranty; indeed, suits had been brought by the owner of what proved to be an outstanding and paramount title to all this land; and judgments were recovered therein against Randall and Grossnickle in May, 1911. These judgments were affirmed by the circuit court in November, 1911, and by the Supreme Court of Ohio May 27, 1913. Gaskill knew of the pendency of these suits, and attended the session of the circuit court when the decision was rendered against Grossnickle; the subject of compromise was then considered in Gaskill's presence, but he advised that the decision of the Supreme Court be obtained; and he testifies that on June 4 or 5, 1913, shortly after the decision of the Supreme Court, a compromise was talked about "in my place," inferentially at his home. Suits were subsequently brought against him by Grossnickle and Randall in the Warren common pleas to recover damages for breach of his covenants of warranty; and in May, 1914, judgment was recovered by the former for $1,619.03 and by the latter for $1,606.96. These judgments, of course, operated to fix the amount of Gaskill's liability under each of his covenants of warranty; but the amount in each instance could be readily ascertained in advance of judgment.

The Ohio rule of damages in such cases is the amount of the consideration received by the warrantor for the premises, and interest. King v. Kerr, Adm'r, 5 Ohio, 155, 160, 22 Am. Dec. 777; Lloyd v. Quimby, 5 Ohio St. 262, 266; Wetzell v. Richcreek, 53 Ohio St. 62, 73, 74, 40 N. E. 1004. In view, then, of his manifest liability under the covenants, it is clear, and is not disputed, that the practical effect of the earlier judgments establishing the paramount title to the lands Gaskill had conveyed was to render him insolvent at the date of the mortgage now under review. Thus within less than one month after the Supreme Court affirmed the judgments, indeed within 20 days after the discussion of their compromise, the mortgage now in issue, as well as the note it was given to secure, was executed and delivered. It is not clear, nor perhaps important, whether Irwin or Gaskill in-

itiated the subject of the loan, but in one part of his testimony Gaskill states:

"I was the one that requested my son-in-law [Irwin] to borrow the money. I do not know whether he mentioned it first, or me; but I am pretty sure I did. * * * Mr. Irwin did not think he wanted to be secured, nor was he anxious previous to that time; but he got so he wanted his money."

Gaskill wanted $500 more than the sum he owed Irwin. He says, in substance, that he wished to use $300 to pay a note of his in a bank at Loveland, Ohio, and $200 for repairs of buildings on his home premises. The method adopted to secure Irwin's claim and the additional $500 was this: Through arrangement of Irwin and Louis Cordes (who lived at Wyoming and was engaged in business at Carthage, Hamilton county) the note and mortgage were executed at Cincinnati, and, in the presence of Irwin, were delivered by Gaskill to Cordes at Carthage. Cordes had known Gaskill for 20 years and was an intimate friend of Irwin. Cordes was at the time in no financial condition to loan the money for the time called for by the note; he negotiated a loan at a bank in Carthage through pledge of collaterals; he obtained a certified check of the bank for $2,500, payable to Gaskill, delivered it to him, and received the note and mortgage; Gaskill at once cashed the check at the bank, and turned over all the money to Irwin, saying to him that he (Gaskill) had no present opportunity to deposit the $500, that he would not need it for some time, and that Irwin could pay it to him as called for. Irwin thereupon returned all the money to Cordes, who paid it back to the bank with one day's interest. Not a farthing of this money was retained by either Irwin or Gaskill. Cordes indorsed and delivered the note to Irwin; and, through some means not shown, the mortgage was placed of record at Lebanon, Warren county, July 1, 1913. The mortgage was not formally assigned to Irwin until after it had been returned from the recorder's office to Cordes; the assignment bears date October 21, 1913, but as between Cordes and Irwin it seems to have been understood at the time the $2,500 was turned back to Cordes the mortgage, as well as the note, was to be assigned to Irwin. Still it hardly could have been the purpose to have the assignment entered of record, since that has not been done at all; if the assignment had been presented for record, it would have been copied "upon the margin of the record of the mortgage" (4 O. G. C. § 8546), and, of course, would have disclosed Irwin's interest in the instrument.

It resulted that, outside of the immediate parties to the transaction, Irwin's relation to the note and mortgage was not known until he presented his verified claim to the referee; nor were the facts and circumstances underlying the transaction known until the proofs were offered on the creditors' objections to the claim. Discussion of the evidence is unnecessary; the transaction speaks through Gaskill's financial condition and the method resorted to for securing Irwin and benefiting himself. The conclusion is unavoidable that the mortgage was made in contemplation of insolvency, and with a design, known to Irwin as well as Gaskill, directly to prefer Irwin, and indirectly to prefer the Loveland bank, to the exclusion of Randall and Gross-

nickle; indeed, there were no other unsecured creditors of conse-quence to consider. We reach this conclusion in view of the Ohio statutory provision denouncing preferences, and regardless of the one concerning "intent to hinder, delay or defraud creditors"; for while a transaction may be invalid only as a preference, or only as a fraudu-lent transfer, or as both (Dean v. Davis, 242 U. S. 438, 444, 37 Sup. Ct. 130, 61 L. Ed. 419; Fifth-Third Nat. Bank v. Johnson, 219 Fed. 89, 92, 134 C. C. A. 529 [C. C. A. 6]), we do not find it necessary to pass upon any question of actual fraud. Judge Hollister concluded in the course of his opinion:

> "At the time the mortgage was made, Gaskill's assets and ascertained lia-bilities showed a small balance in his favor. The potential indebtedness, growing out of his obligations to Grossnickle and Randall, made a sum much greater than his assets, and if Grossnickle and Randall, or either of them, should seek to make his warranties good, as he knew, and said he knew, they had the legal right to do, he was insolvent when the mortgage was made. * * * It is quite significant that after the decision in the Supreme Court, and before the mortgage was made, Gaskill had resumed negotiations for a compromise and Irwin renewed his request for security. One cannot escape the conviction that the mortgage was given to secure Irwin against the im-pending demands of Grossnickle and Randall and to obtain for Gaskill $500 for his own purposes."

The learned trial judge was of opinion that, in view of a line of Ohio decisions, a debtor in failing circumstances may in good faith pay or secure one or more creditors in preference to others; but he believed that the transaction was lacking in the standard of good faith required. He regarded the $500 arrangement as a secret trust created in favor of Gaskill, and held that this was fatal to the validity of the mortgage.[1]

[7, 8] Does the rule just alluded to in respect of preferences still prevail in Ohio? It is to be observed that this rule, as, for example, Judge Ranney expressed it in 1854, permitted a creditor of an insolv-ent debtor, or one having assumed liabilities for him as surety, to take from him a mortgage to secure the debt or to save him harmless from such liability; and, as the reward of his diligence, he would be protected in the priority so obtained. Bloom v. Noggle, 4 Ohio St. 45, 57. The rule as thus stated implies, as the decision itself shows, that the transaction must have been made in good faith; and Judge Spear stated the rule in Cross v. Carstens, 49 Ohio St. 569, 31 N. E. 508, in 1892, as follows:

> "This court has not omitted to affirm the right of a debtor, in failing cir-cumstances, in good faith, to pay or secure one or more creditors in preference to others."

---

[1] The decisions referred to in support of the opinion that a debtor may make a preference as stated were Cross v. Carstens, 49 Ohio St. 548, 569, 31 N. E. 505, and citations; Walker v. Walker, 4 Ohio N. P. 324. And the cases relied on as to the effect of the secret trust found were Dickson v. Raw-son, 5 Ohio St. 218, 224; Loudenback v. Foster, 39 Ohio St. 203; Hegler v. Grove, 63 Ohio St. 404, 59 N. E. 162; Schultz v. Brown, 3 Ohio Cir. Ct. R. 609. 611; Lukins v. Aird, 6 Wall. 78, 18 L. Ed. 750; Huntley v. Kingman, 152 U. S. 527, 533, 14 Sup. Ct. 688, 38 L. Ed. 540.

It cannot be questioned that the rule, as thus in substance pointed out, was uniformly maintained in Ohio for more than half a century; and yet it would seem that the General Assembly of Ohio has introduced certain statutory alterations which were meant to work a distinct change of the rule.[2] It is true that in Bank v. Gettinger, 68 Ohio St. 389, 67 N. E. 739, reversing the decision of the Lucas circuit court (13–23 O. C. C. 77), it was held that under sections 6343 and 6344 of the Ohio Revised Statutes, as amended April 26, 1898 (93 O. L. 290), certain creditors who in effect had been preferred could not be compelled to repay money which they had received from their debtor while he was insolvent, although he made the payments in contemplation of insolvency and with a design to prefer these creditors to the exclusion of the others, or with intent to hinder, delay, or defraud his creditors, even though he made an assignment which was filed within 90 days after such payments.[3] The reasons for this ruling are important, and are to be found in the opinion (pages 399, 400); they may be stated thus: (1) That the creditors were conceded to have "acted in good faith, and without notice, in receiving" the payments; and (2) that payment was not, while "sale, conveyance, transfer, mortgage, or assignment" was, prohibited by the statute. The first reason clearly implies that, if the creditor is cognizant of his debtor's purpose, the preference must fail. The second reason we think finds apt illustration in the Ohio Supreme Court's affirmance, without opinion, of Brewing Co. v. Peltz, 81 Ohio St. 566, 91 N. E. 1136, decision below 17 Ohio Cir. Ct. R. (N. S.) 1, appearing there as Pabst Brewing Co. v. Johnson. Examination of the record in that case, to which attention has been called by counsel, shows that the circuit court in substance found that when the creditor Pelitz (Peltz) and two other named creditors received payment of their claims they "knew of the insolvency" of their debtor, Johnson, and of his intention to secure the payment of their claims by an instrument previously signed by Johnson. This instrument provided for payment to Peltz of sufficient money to cover his claim and the claims of the two other creditors, and was executed with the understanding that Peltz was to apply the money accordingly; but the instrument appears at last to have been canceled, and the three claims were in fact paid in cash by Johnson's attorney at his direction. It is to be inferred that the original design to make Peltz a trustee under the instrument was abandoned, and direct payment in cash to each of the creditors resorted to, for the very purpose of avoiding the statute.

---

[2] The statutory changes thus referred to may be readily seen by comparison of sections 6343 and 6344 (2 Ohio Rev. Stat., Ed. 1880, in force when Cross v. Carstens was decided) with the same sections as amended April 26, 1898 (93 Ohio Laws, 290), and as later amended and renumbered (3 O. G. C., §§ 11102 to 11107; and see sections set out in Stellwagen v. Clum, 218 Fed. 733, 735, 134 C. C. A. 408 and in same case, 245 U. S. 609, 611, 38 Sup. Ct. 215, 62 L. Ed. 507).

[3] Under section 6343 as it then stood, every "sale, conveyance, transfer, mortgage or assignment" made by a debtor with such design or intent as above stated, was to be "conclusively deemed and held to be fraudulent" in the event of the debtor making and filing an assignment within ninety days thereafter. 93 Ohio Laws, 290. This provision however was repealed as early as 1902, and has not appeared in any enactment since.

This inference is in accord with the second reason stated, as we have seen, in Bank v. Gettinger, 68 Ohio St. at page 400, 67 N. E. 739, and the reason itself points to a distinct ground, and the only satisfactory one we can discover, for the affirmance of Brewing Co. v. Peltz. It is to be observed, moreover, that the reason for treating payment as not falling within the inhibition of the statute, as held in Bank v. Gettinger, was in accord with earlier rulings of the same court. Thus, under the statute of 1838 (36 O. L. 56, § 3), a bill of sale, in effect a mortgage of chattels, was held not to fall within the provision forbidding "assignments" of debtors to trustees "in contemplation of insolvency with the design to prefer one or more creditors," etc. (Atkinson v. Tomlinson, 1 Ohio St. 237, 240, 241). Again, in speaking of the scope of the statute considered in Cross v. Carstens (set out in 49 Ohio St. at page 565, 31 N. E. 506), which in terms made "assignments" to a trustee, etc., to prefer particular creditors "inure to the equal benefit of all creditors," it was said (49 Ohio St. 566, 31 N. E. 507):

"The language does not include all transfers, nor all conveyances, made in contemplation of insolvency, but assignments, and it is assignments by the failing debtor in trust to a trustee, which the Legislature has declared must inure to the benefit of all creditors."

We may now direct attention to the language of the present statute. Section 11104, 5 O. G. C., provides:

"A sale, conveyance, transfer, mortgage or assignment, made in trust or otherwise, by a debtor or debtors and every judgment suffered by him or them against himself or themselves in contemplation of insolvency and with a design to prefer one or more creditors to the exclusion in whole or in part of others and a sale, conveyance, transfer, mortgage or assignment made, or judgment procured by him or them to be rendered, in any manner with intent to hinder, delay, or defraud creditors shall be void as to creditors of such debtor, or debtors at the suit of any creditor or creditors. In a suit brought by a creditor or creditors of such debtor or debtors for the purpose of declaring such sale void, a receiver may be appointed who shall take charge of all the assets of such debtor or debtors, including the property so sold, conveyed, transferred, mortgaged, or assigned, and also administer all the assets of the debtor or debtors for the equal benefit of the creditors of the debtor or debtors in proportion to the amount of their respective demands, including those which are unmatured."

Section 11105 provides that the foregoing section—

"shall not apply unless the person * * * to whom such sale, conveyance, transfer, mortgage or assignment is made, knew of such fraudulent intent on the part of such debtor * * * nor shall anything in such section contained vitiate or affect any mortgage made in good faith to secure any debt or liability created simultaneously with such mortgage, if such mortgage be filed for record * * * within three days after its execution. * * *"

Section 11106 provides:

"Any creditor * * * whether the claim of such creditor * * * has matured or will thereafter mature, may commence an action * * * to have such acts or things declared void. * * *"[4]

[4] It is important here to observe the contrast between the language of the first full sentence of section 11104, above quoted, commencing with "a sale, conveyance," etc., and ending with "at the suit of any creditor or creditors" (enacted April 30, 1908, 99 O. L. 241), and that of section 6343 and the first

These provisions disclose some legislative purposes that cannot well be mistaken. A number of transactions are now denounced as preferences in addition to the one forbidden by the old statute. It is worthy of notice that this change originated in 1898 (93 O. L. 290), the year in which the federal bankruptcy statute was enacted; and in view of some features of resemblance between the two enactments, as, for instance, those in relation to preferences, it is not too much to say that the two legislative bodies were in these respects moved by the same considerations; nor can well-considered interpretations that have been placed upon the federal or the state provisions of kindred character be safely ignored, when passing upon either the one or the other. Considering the statutory changes made in Ohio, they serve to show the purpose of the new statute, and also to differentiate Ohio decisions like Cross v. Carstens, which involve only the old statute, from decisions like Bank v. Gettinger, which construe the new one. As regards preferences, the old statute was limited to "assignments in trust to a trustee or trustees," while the new one is extended to a "sale, conveyance, transfer, mortgage or assignment made in trust or otherwise, by a debtor," and to "every judgment suffered by him * * * against himself." This enlargement in scope discloses a legislative purpose to establish a comprehensive rule of equality in place of the old system of inequality in the distribution of an insolvent's assets among his creditors.

The inevitable effect of enumerating transactions—"sale, conveyance, transfer, mortgage"—in addition to the old one, "assignment," was to meet the decisions before mentioned, which held that transactions like the newly added ones were not included in "assignments," and was thus greatly to expand the rule of equal distribution. But this was not all. The transactions so added, as also the old one of assignment, were under the conditions named all expressly denounced as preferences, whether made in trust or otherwise. Surely such an extension of objects, and regardless of the presence or not of a trust, cannot be treated as meaningless; its significance is plain. Still another scheme of preference was condemned; it was the old practice of debtors in failing circumstances to permit judgments to be taken against them, and so to

three lines of section 6344, as those sections stood when considered in Cross v. Carstens; and as they appeared in 2 Ohio Rev. Stat., Ed. 1880, and in 1 Ohio Rev. Stat., Smith & Benedict's Edition: "Sec. 6343. All assignments in trust to a trustee or trustees, made in contemplation of insolvency, with the intent to prefer one or more creditors, shall inure to the equal benefit of all creditors, in proportion to the amount of their respective claims, and the trusts arising under the same shall be administered in conformity with the provisions of this chapter"—and "Sec. 6344. All transfers, conveyances, or assignments made by a debtor or procured by him to be made with intent to hinder, delay, or defraud creditors, shall be declared void at the suit of any creditor. * * *" The remaining portion of section 6344 furnished a mode for division of the property involved, or its proceeds, in a transaction had under either of the sections, among all the creditors alike or among such as might institute suit to set aside the transaction and through publication, etc., secure division among themselves. These provisions were of course repealed in 1898, and they are now replaced by the presently subsisting act of 1908, above cited.

invest favored creditors with prior liens. We find effective illustration of the scope and object of this legislation in the transaction here in issue. The transaction, involving as it does a mortgage, is distinctly named in the statute; and such an instrument, when made in contemplation of insolvency and with the forbidden design, is characterized as a preference, whether made in trust or otherwise. It would be difficult to devise language more specific than this to describe and forbid the transaction. This is made even more clear through comparison of the language of this statute with that of sections 60a and 60b of the bankruptcy statute (Comp. St. 1916, § 9644).

Another feature of the Ohio statute gives emphasis to the legislative purpose. The consequence of preferences is changed. Provision is made in section 11104 to take possession of all the assets of the debtor, not merely such as are embraced in the preference, and the receiver is required to administer the debtor's entire assets for the equal benefit of the creditors. This provision was relied on by counsel in the Stellwagen Case as distinctly supporting the claim that section 6343 offended against the Bankruptcy Act, especially sections 60 and 67, 218 Fed. 734, 736, 134 C. C. A. 408. True, this claim failed; yet the departure so made in the state legislation is in harmony with the purpose already pointed out to break up the old rule and practice of preference wherever both parties to the transaction were aware of its design. This is shown by the modification made in section 11105 in favor of an innocent beneficiary of a preference, and also by Bank v. Gettinger, 68 Ohio St. at 400, top, 67 N. E. 739, and the Bobilya Case, 68 Ohio St. 373, 67 N. E. 736, there referred to.

It may be added that there is no suggestion of lack of power in the state Legislature to enact the sections of the statute here involved; nor is it perceived how such an objection could rationally be urged. It is true that the Ohio courts have treated the right of preference as resting upon the natural right to acquire and control property (Cross v. Carstens, 49 Ohio St. at page 573, 31 N. E. 506); yet no one questions the constitutional validity of old section 6343, prohibiting preferences by "assignments in trust to a trustee" when made in contemplation of insolvency, and the present sections are well within this principle.[5]

How, then, is the mortgage under review to be treated? We have seen that the mortgage was given to secure a past-due debt of Gaskill to Irwin for $2,000, and also an additional sum of $500, which on the date of delivery of the mortgage Irwin in effect promised to pay to Gaskill later and as Gaskill should call for it. Irwin knew that the object of providing this additional sum was to enable Gaskill (1) to pay a debt of $300 owing by him to a bank in Loveland, and (2) to use the remainder, $200, for repairing certain buildings on the property so to be mortgaged. Several months after delivery of the mortgage and its assignment Irwin paid the $500 to Gaskill and the latter used the money

[5] It scarcely need be said that this conclusion is in no wise affected by the decision in Williams & Thomas Co. v. Preslo, 84 Ohio St. 328, 95 N. E. 900, Ann. Cas. 1912C, 704, declaring another portion of the statute (section 11102), which related exclusively to sales in bulk of stocks of merchandise, to be constitutionally invalid.

for these purposes. Thus $2,300 of the sum in terms secured by the mortgage represents old obligations of Gaskill, and the remainder new improvements of the mortgaged property. Giving to the portion of the statute denouncing preferences the natural and ordinary meaning of its language, we think it condemns the mortgage, certainly to the extent of Gaskill's indebtedness to Irwin and the Loveland bank, as an unlawful preference. There can be no difference in principle between the parts of this indebtedness; each was an existing and unsecured obligation. It is true that the Irwin debt was past due and that the bank debt had not matured at the date of the mortgage. Gaskill testifies as to the latter:

"I let the $500 remain in Mr. Irwin's hands for several months for the purpose of paying a certain note off in the bank which was not due. * * *"

This was to create through Irwin and Gaskill a trust obligation in favor of the subsisting creditor, the bank. Whether the bank had knowledge or not of the arrangement, forbidden as it was under the old and the new statute alike, is unimportant, since in either event the effect upon the excluded creditors was the same. Assuming that the bank is not amenable to an action for recovery of the money, yet to permit Irwin, as against the other creditors, both to take part and recover in such a transaction, would be to suffer him to take advantage of his own wrong. Indeed, it must be remembered throughout that Gaskill and Irwin were cognizant of the purpose of every feature of the transaction from the beginning and were actuated alike by the very design the statute condemns. Further, the case is fairly within the plain implication arising, as before pointed out, from the first of the two grounds upon which the judgment in Bank v. Gettinger, 68 Ohio St. at page 400, 67 N. E. 739, was rested. We therefore hold that, so far as the effect of the mortgage was to secure Gaskill's pre-existing indebtedness, $2,300, to Irwin and the Loveland bank, the mortgage is void as to creditors.

[9, 10] As respects the remaining sum secured by the mortgage a different question arises. Section 11105, as we have seen, provides that nothing in section 11104 shall "vitiate or affect any mortgage made in good faith, to secure any debt or liability created simultaneously with such mortgage," if the mortgage be recorded within three days. Literally this provision of itself would seem to render the mortgage unavailable for any purpose, since it was not recorded within the three-day period. The substance of the provision, however, is but declaratory of a settled rule of judicial decision; and, of course, effect should be given to the statutory exception, so far as this may be done consistently with the rest of the enactment. In a sense the $300 represented a "debt or liability created simultaneously with" the mortgage. Yet there is a broad distinction between that debt and the one created at the same time in reference to repairs upon the debtor's buildings. The one was to meet an existing and unsecured obligation, and the other to provide, through obligations not then created, for the improvement of the mortgaged property. The repairs, both as contemplated and carried out, were such as to entitle unpaid materialmen and mechanics alike to stat-

utory liens on the property. Title 7, div. 4, c. 1, 3 O. G. C. p. 1081 et seq. To all intents and purposes then a present and fair exchange in values was made of Irwin's promise to furnish money, $200, and Gaskill's promise to repair the mortgaged property; the result of Gaskill's application of the money was at once to obtain the improvements and avoid liens on the part of materialmen and mechanics; it therefore cannot be said that this part of the transaction offended against the provision forbidding a preference, nor, in the absence of intentional fraud, that the mortgage may not be enforced, except as it was designed to operate as a preference. Corbett v. Woodward, Case No. 3,223, 6 Fed. Cas. 531, 537, 538.

It results that the decree must be reversed, and the cause remanded, with direction to modify the decree, so far as to sustain Irwin's claim as a secured claim, as well as the mortgage, to the extent of $200, with interest from the time such sum was advanced, and also to diminish Irwin's unsecured claim accordingly. The costs of this appeal, including the expense of preparing as well as printing the transcript, will be equally divided.

---

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes